1999 ME 4

**WALTMAN & CO.**

v.

**Mark LEAVITT.**

Supreme Judicial Court of Maine.

Submitted on Briefs Nov. 17, 1998.

Decided Jan. 6, 1999.

John A. Graustein, Christopher G. Jernigan, Drummond, Woodsum & MacMahon, Portland, for plaintiff.

Jeffrey T. Edwards, Preti, Flaherty, Beliveau & Pachios, LLC, Portland, Robert E. Miller, Spencer, Zmistowski & Miller, Old Town, for defendant.

Before WATHEN, C.J., and CLIFFORD, DANA, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] Mark Leavitt appeals from the judgment of the Superior Court (Cumberland County, *Cole, J.*) after a jury-waived trial awarding the proceeds of a fire insurance policy to Waltman & Co. Leavitt argues that he was entitled to the proceeds as a matter of law, and that the trial court erred by finding the parties agreed that Leavitt would be responsible for insurance and, in the event of loss, Waltman & Co. would receive the net benefit of any insurance proceeds. We affirm the judgment.

[¶ 2] Waltman & Co. is a corporation in the business of building residential homes with its principal place of business in Yarmouth. During the early 1980s, Leavitt joined Waltman & Co. as a carpenter, and later became business partners with Joseph Waltman, the company's president.

[¶ 3] In 1987, in an effort to provide Waltman & Co. with working capital, Waltman conveyed to Leavitt a deed to property located in Charlotte. The property, referred to as the camp property, consisted of a two-story winterized residence on a one-acre lot with more than 300 feet of lake frontage. Leavitt, as planned, used the camp property as security to obtain a loan from a bank. Leavitt then placed the proceeds from the loan into Waltman & Co., with Waltman agreeing to pay the mortgage, taxes, and expenses. The parties agreed the camp property would eventually return to Waltman, who retained exclusive use of the camp despite having conveyed title.

[¶ 4] By 1991 the relationship between Leavitt and Waltman had deteriorated. Waltman & Co. defaulted on financial obligations to Leavitt, and Leavitt sued seeking both repayment of cash contributions to the company and payments in connection with the camp property. After months of negotiations, during which the parties were represented by counsel, the parties reached a settlement of all claims on August 3, 1994. The settlement agreement was intended to resolve all of their disputes.

[¶ 5] The settlement agreement includes the written agreement itself, three promissory notes from Waltman & Co. to Leavitt, and a deed for the camp property from Leavitt to Waltman to be released from escrow upon payment of the third note. Note I, in the amount of $24,500, was to repay Leavitt for a loan, vacation time, and various expenses. Note II, for $27,906.30, was to reimburse Leavitt for all payments related to the camp property. Note III was a balloon payment of $26,745.91 to pay off Leavitt's mortgage on the camp property. This third note was due September 17, 1995, at which time the deed would be released from escrow.

[¶ 6] On September 10, 1995, while Note III was still outstanding, the camp property was destroyed by fire. As of that date, Leavitt was still the legal owner of the property because Waltman & Co. had not yet completed its obligations under the settlement agreement. By letter, Leavitt informed Waltman & Co. that it had defaulted under the agreement by failing to make both the current month's mortgage payment and the balloon payment of Note III, and by failing to maintain fire insurance on the property. On September 25, 1995, within the time period to cure a default, Waltman & Co. made the final payments to Leavitt. Leavitt accepted the payments; paid Fleet Bank, the holder of the mortgage, in full; and the mortgage was discharged. Without objection from Leavitt, his attorney released the deed from escrow.

[¶ 7] Prior to the settlement agreement, Leavitt had maintained fire insurance on the property in his own name as required by his mortgage. He continued to maintain the insurance. After the fire, both Waltman &

Co. and Leavitt claimed the proceeds from the policy, and Waltman & Co. sued to recover them. The insurance company deposited the proceeds of the policy, $60,270, with the court pending resolution of the litigation.

[¶ 8] The Superior Court ruled that Waltman & Co. was entitled to the insurance proceeds. It examined the negotiations, the surrounding circumstances, the agreement, and the notes, and found the parties agreed that any insurance proceeds would go to Waltman & Co. The trial court's factual finding will not be reversed unless the record does not contain competent evidence to support it or unless the finding is based on a clear misapprehension by the trial court of the meaning of the evidence. *See Carvel Co. v. Spencer Press, Inc.*, 1998 ME 74, ¶ 10, 708 A.2d 1033, 1035. We conclude that the finding is supported by competent evidence and is not based on a misapprehension.

[¶ 9] Insurance contracts are personal in nature; they do not run with the land. *See Quigley v. Caron*, 247 A.2d 94, 95 (Me.1968). Parties can, however, agree that the proceeds will go with the land or that one party or the other will be entitled to them in the event of loss. *See Pruitt v. Meyer*, 2 Wash.App. 14, 467 P.2d 364, 368 (Wash.Ct. App.1970).

[¶ 10] Whether a contract is ambiguous is a question of law; if it is ambiguous its interpretation is a matter of fact. *See Kandlis v. Huotari*, 678 A.2d 41, 43 (Me. 1996). When a contract is reasonably subject to two or more interpretations, or its meaning is unclear, it is ambiguous. *See id.*

[¶ 11] This contract consists of the settlement agreement, the deed, and the three notes. There is no language in the settlement agreement or deed regarding insurance or insurance proceeds. The only mention of insurance in these documents is in the three notes which contain identical clauses stating that Waltman & Co. is in default if it does not maintain fire insurance "with the holders hereof as loss payees sufficient to protect the secured interests of all secured creditors with respect to the property securing this obligation; ..." The meaning of this clause is uncertain. Specifically, it is unclear

whether Leavitt, as the holder of the note, and a loss payee of insurance, is also a secured creditor. The bank, which was the mortgagee of the camp property, was a secured creditor at the time of the execution of the note, but whether Leavitt as the owner of the property could also have been a secured creditor by virtue of the agreement and notes is unclear. This ambiguity also renders unclear the amount of the insurance to be maintained. Furthermore, only the third note dealt with the mortgage on the camp property and at least one note had nothing to do with the camp property, making the insurance language meaningless in one, if not two, of the notes. In sum, the agreement between the parties is ambiguous on the issue of insurance.

[¶ 12] Because the agreement is ambiguous, it was necessary for the court to interpret the agreement. *See Kandlis*, 678 A.2d at 43. The primary rule of interpretation is to give effect to the intention of the parties. *See SC Testing Tech., Inc. v. Department of Envtl. Protection*, 688 A.2d 421, 424 (Me.1996). The court is to ascertain the intention of the parties by looking at the agreement itself, taking into consideration the subject matter, motive and purposes of the parties, as well as the object to be accomplished. *See Bumila v. Keiser Homes of Me., Inc.*, 1997 ME 139, ¶ 12, 696 A.2d 1091, 1094.

[¶ 13] Several of the circumstances surrounding the agreement support the trial court's decision. First, Leavitt was obligated by the mortgage to maintain insurance on the camp property, which he did. There would be no reason to require Waltman & Co. also to maintain insurance.

[¶ 14] Second, the purpose of the parties' agreement was to resolve their financial disputes, including the return of the camp property to Waltman once Leavitt was paid what he was owed by Waltman & Co. There was no intent for one party to receive a windfall at the expense of the other.

[¶ 15] Third, the trial court referred to exhibits submitted by Waltman, his testimony, and the deposition of Leavitt's attorney during the negotiations. The court found

that from 1987 through the negotiations in 1994, both parties understood that Leavitt would buy and maintain insurance on the camp property, and that in the event of a loss, they would use the proceeds to satisfy his expenses and the mortgage, and then deliver any remaining funds to Waltman. This was an established course of conduct for several years prior to the written agreement. During negotiations, Leavitt's attorney orally stated that Leavitt would continue to pay for the insurance. There was also a letter written by Leavitt's attorney during the negotiations in which he stated Leavitt would be willing to pay the taxes and insurance on the property. From testimony by Leavitt's lawyer, the trial court found the language in the notes regarding insurance to be "unnegotiated boilerplate" taken from a standard form and not added intentionally by the parties.

[¶ 16] These surrounding circumstances support the trial court's finding that the intention of the parties was that Leavitt was responsible for the insurance and any insurance proceeds would go to Waltman & Co.

The entry is

Judgment affirmed.