STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-044
GAB-YOR- 6/27/2001

CALEB AFFORDABLE HOUSING
ASSOCIATES, L.P.,

Plaintiff

v.                                                          ORDER

NORTHERN UTILITIES, INC., et als.,

Defendants

Pending is Northern Utilities' Motion for Summary Judgment. Following hearing, the Motion is Denied.

## FACTUAL BACKGROUND

Plaintiff Caleb Affordable Housing Associates Limited Partnership ("Plaintiff"/ "Caleb") owns affordable housing units for low-income families and the elderly. Three of Plaintiff's properties, Pine Ledge, Ledgewood and Ledgewood North Condominium units (collectively "the properties") are located in Saco, Maine. **Northern Utilities Statement of Material Facts (NU- SMF) ¶ 1.** Prior to 1995, Plaintiff's properties were heated by electric power. NU-SMF ¶ 9. In order to secure Maine State Housing Authority financing for the properties, Caleb needed to convert the electric heating system at the properties to another heating system. NU-SMF ¶ 9.

In December 1994, Plaintiff entered into a contract with Square One Construction, Inc. ("Square One"), a general contractor, to undertake the installation

of Rinnai heaters in the Pine Ledge units[1]. NU-SMF ¶ 10. This contract states: "The following defines the scope of work to be performed by the contractor at Pine Ledge, Saco ME under the terms of the contract between [Caleb] and Square One Construction, Inc. the contractor . . . Install one Rinnai 551F direct vent gas heater in each living room (48 apts) and connect to gas main installed by Northern Utilities. Convert from propane to natural gas when mains are installed in June 1995." NU-SMF ¶ 11.

In December 1994, Plaintiff also entered into a contract with Northern Utilities ("Northern"). This contract stated that: "Customer requests the installation of 46 gas service(s) from the outside foundation wall to the nearest point on the Company's gas main at Pineledge, Ledgewood, Ledgewood North, Saco, Maine. Customer requests the extension of the Company's gas main to a point where a gas service(s) can be connected to supply with Customer with gas at Pineledge, Ledgewood and Ledgewood North." NU-SMF ¶ 16. The contract also stated that "[Northern] will be responsible for the performance of all necessary work incident to the installation of any services or mains in compliance with the applicable laws, standards and codes." Plaintiff's Statement of Material Facts (PSMF) ¶ 16.

In January 1995, Square One subcontracted with Maine Properties Inc., d/b/a MPI Plumbing, Heating and Air Conditioning ("MPI") for the work to be done at Plaintiff's properties. Specifically, MPI contracted with Square One to: "[i]nstall (40)

---

1 Apparently Ledgewood and Ledgewood North also had new heaters installed, but the installation of these heaters is not at issue.

2

Rinnai 1001F & (92) 551 Direct Vent gas heaters in the living rooms of each apartment. Install gas piping from the unit to the gas meter location. . . . Test, Fire and adjust." NU-SMF ¶ 13.

A Rinnai heater may be fueled by either propane or natural gas. NU-SMF ¶ 14. In December 1994, Plaintiff contracted with Bay State Gas Company ("Bay State") for the supply of propane gas to the properties. NU-SMF ¶ 19. Pursuant to this contract, Bay State agreed to supply Plaintiff with propane gas to operate the Rinnai heaters in the interim period following their installation by MPI, but before Northern completed its natural gas line extension. NU-SMF ¶ 19.

From January through May of 1995, MPI installed Rinnai heaters at Pine Ledge. NU-SMF ¶ 21.[2] In April or May of 1995, the Rinnai heaters at Pine Ledge began to operate on propane gas. NU-SMF ¶ 23. Before a Rinnai heater can be fueled by natural gas, the heater must be converted to operate on natural gas because propane gas operates at a pressure level higher than natural gas. NU-SMF ¶ 32. Northern alleges that a Rinnai heater can only be converted from propane to natural gas through the adjustment of an orifice located with the heater itself. NU-SMF ¶ 28. Co-defendant Pine State Plumbing and Heating Inc.,[3] ("Pine State") disputes this allegation, and states that converting a Rinnai from propane to natural

---

[2] The record references do not support the commencement/completion dates cited in NU-SMF, but clearly MPI was working on the properties in January through May.

[3] Pine State purchased the assets of MPI on September 11, 1995. Pine State was not in existence when the Rinnais were installed. MPI still exists and has also filed an Opposition to Northern's Motion for Summary Judgment, but has not filed a statement of material facts.

3

gas is a two-step process that involves: (i) replacing the propane orifice with a natural gas orifice; and (ii) turning the gas on and adjusting the pressure setting on the unit down from 9.4 W.C. to 3.5 W.C. **Pine State's Statement of Material Facts (PS-SMF) ¶ 28.**

It is not disputed that the heaters were not adjusted for operation on natural gas. **NU-SMF ¶ 27.**[4] The failure to adjust or set the appropriate gas pressure caused the heaters to become "over-fueled" and damaged all the Rinnai heaters beyond repair. **Complaint ¶ 12, PS-SMF ¶¶ 34, 43.**

Pine State alleges that the orifices in the units were properly converted, but MPI could not fire the units and check and adjust the gas pressure on the units because Northern had not yet completed construction of its natural gas main to the property. **PS-SMF ¶ 27.** Pine State alleges that it was the prevailing custom for Northern to fire the units and test the pressures - plumbing and heating specialists generally did not turn on gas from a utility company's meters when a new service was being established. **PS-SMF ¶ 29, 36.** Pine State further alleges that Northern's work orders for the Pine Ledge units lists the job code for those units as a "1052." **PS-SMF ¶ 38.** In "most cases," "1052" is a computer code that calls for Northern technicians to "put the meter in place, turn the meter on, and actually go in and light the appliances as needed." **PS-SMF ¶ 38.** However, this, according to Northern, is only true when an owner has contracted with Northern for such work. Northern

---

4 More accurately, Pine State alleges that the orifices of the Rinnai heaters were converted from propane to natural gas using Rinnai factory parts. PS-SMF ¶ 27. However, it is not disputed that the pressure setting for the Rinnais were not adjusted and reset for natural gas.

**Utilities Reply Statement of Fact (NU-RSMF) ¶ 38.** Northern argues that it was not responsible, contractually or otherwise, for firing, testing and adjusting the pressure on the heaters.

In a Complaint alleging negligence (Count I) and breach of contract (Count II), Plaintiffs allege that the heaters in the Pine Ledge units began to malfunction during the first winter they were in use and by February of 1999, all 48 Rinnai heaters at Pine Ledge had failed and were damaged beyond repair. **Complaint ¶ ¶ 11, 12.**

Northern Utilities has cross-claimed against Square One, MPI and Pine State, alleging that the Plaintiff's injuries were proximately cause by these Defendants and in the event that North Utilities is found liable to Plaintiff, they are entitled to contribution from the Cross-Defendants. MPI and Pine State have asserted cross-claims against Northern for contribution.

## BREACH OF CONTRACT

Northern argues that its contract with Plaintiff plainly and unambiguously provides that Northern was only obligated to extend its natural gas line to Plaintiff's buildings and to set meters on the exterior of the buildings. Northern's obligations to Plaintiff ended at Pine Ledge's exterior walls. Northern did not have a contractual duty to Plaintiff to do anything with regard to the installation, conversion or inspection of the Rinnai heaters; only Square One had such contractual obligations to Plaintiff. Square One was contractually responsible to convert the heaters from propane to natural gas.

Caleb argues that summary judgment is inappropriate in cases involving construction contracts where the quality and manner of performance is at issue and must be determined by customary trade and industry practices which are implied terms in the contract. There is a factual dispute as to whether customary trade and industry practice placed the responsibility on the natural gas contractor or the plumber for testing and ensuring that the heaters were properly adjusted before firing. MPI has stated in its answers to interrogatories that this job is customarily the responsibility of the natural gas contractor. Northern disputes this. This dispute cannot be resolved on the face of the contract, but rather is a factual matter to be resolved by the fact finder.

As well, the contract contains an ambiguity as to the scope of Northern's responsibilities. The first paragraph of the contract states that Northern will be "responsible for the performance of all necessary work <u>incident</u> to the installation of any services or mains in compliance with the applicable laws, standards and codes." The incidental "necessary work" for which Northern was responsible cannot be determined from the four corners of the contract. There is a factual issue as to the scope of this incidental work making summary judgment inappropriate.

Pine Tree argues that Northern's contract with Caleb is ambiguous because [as argued by Caleb above] the contract is silent on what is meant by "all necessary work incident to the installation." If contractual terms are ambiguous and subject to different interpretations, parol evidence can be presented to ascertain the meaning of the contractual language. Evidence of customs that affect the rights and

obligations of the parties is permissible. This is especially true in cases involving construction-type contracts because the performance of such contracts is generally determined by evaluating trade customs and practices. Here, there is ample evidence to suggest that is was customary for gas utility companies, in 1995, to turn on gas to new service locations, fire new gas heaters and adjust the gas pressure on those heaters.

## DISCUSSION

It is not disputed that the heaters were not tested and adjusted for natural gas usage and it is not disputed that the heaters ultimately failed as a result. The dispute in the present case is which contractor was responsible for testing, firing and adjusting the heaters.

Northern argues that it was not contractually obligated to test and adjust the pressure on the heaters. Where contractual language is plain and unambiguous, summary judgment is appropriate because the interpretation of such a contract presents a question of law for the court. KHK Associates v. Department of Human Services, 632 A.2d 138, 139-40 & n. 1 (Me. 1993). Therefore, the "threshold question in contract interpretation is whether or not the contract is ambiguous in any material respect." Devine v. Roche Biomedical Laboratories, 637 A.2d 441, 445 (Me. 1994). The issue of whether a contract is ambiguous is one of law. Id. Contract language is ambiguous when it is reasonably susceptible of different interpretations. Id. If the court determines that a contract contains an ambiguity, the court must interpret the agreement "to ascertain the intention of the parties by looking at the

7

agreement itself, taking into consideration the subject matter, motive and purpose of the parties as well as the object to be accomplished." Waltman & Co. v. Leavitt, 1999 ME 4, ¶ 12, 722 A.2d 862, 864 (Me. 1999).

Pursuant to the parties agreement, Northern agreed to install "46 gas service(s) from the outside of the foundation wall to the nearest point on the Company's gas main . . . [and] extend[] . . . the Company's gas main to a point where a gas service(s) can be connected to supply [Caleb]." The contract also stated that "[Northern] will be responsible for the performance of all necessary work incident to the installation of any services or mains in compliance with the applicable laws, standards and codes." It is this last provision that is in dispute. Northern argues that there is no ambiguity whatsoever in this provision, or in the contract as a whole. Northern argues that their contractual obligations to Caleb ended at Pine Ledge's exterior walls and the "necessary work incident" to their services relates only to the work incident to the installation of a gas main. Northern notes that Plaintiff contracted with Square One[5] to convert the heaters from propane to natural gas and that MPI, in its agreement with Square One, agreed to "test, adjust and fire" the heaters.

Although the language of the Square One/MPI contract obligates MPI to perform the heater conversions, Northern's contractual obligations and role in the conversion process is uncertain, thereby precluding summary judgment. Contrary

---

[5] Square One has filed an Answer, but did not file an Opposition to Northern's Motion for Summary Judgment.

8

to Northern's assertions, the contract is ambiguous regarding the scope of Northern's responsibilities. First, the "necessary work incident to the installation [of the gas mains]" cannot be determined from the four corners of the contract. Pine State has alleged that in 1995 it was the industry standard for gas utility companies to set the meter, turn on the gas, fire the heaters and adjust pressures inside the building when new service was established. **PS-SMF ¶ 29.** This allegation is supported by the testimony given by Curtis Burrill, a service and metering supervisor with Northern Utilities, at his deposition:

> Q: Northern Utilities would then be contacted to come with a meter, set the meter, turn on the gas, and fire the equipment. Is that the standard procedure for '95?
>
> A: Not in all cases, no.
>
> Q: Would you say it's the majority procedure for '95?
>
> A: Majority of procedure, yes.
>
> See Curtis Burrill Dep. at 37 (attached to PS-SMF).

Northern's own practices and procedures underline the fact that Northern's responsibilities were not written in stone, but that their responsibilities were fluid, dictated not only by standard procedures but also by an informal give and take between contractors in the field. For example, Curtis Burrill testified that:

> Q: Part of the coordination [between MPI and Northern] was a more informal give and take that you had with MPI?
>
> A: Correct.
>
> See Curtis Burrill Dep. at 54 (attached to PSMF).

9

As well, Pine State has alleged that when MPI installed the heaters and converted the orifices, Northern had not yet completed installing the gas main. As a result, Pine State could not adjust the pressure to a setting appropriate for natural gas. Mr. Burrill testified that there was "a verbal agreement with Sam Marcisso (president of Pine State) to set the meters and leave them off for MPI to fire the units as they converted the units." **Burrill Dep. at 20.** Mr. Burrill also indicates, however, that only under certain circumstance would Northern leave the firing, testing and adjusting for the contractor:

Q: Now, when a meter is left off, can the plumber then turn the meter on?

A: He can.

Q: Is that something that you authorize them to do?

A: Under the verbal agreement, that would be the only way that they could get that gas on, yes.

Q: Is that a typical practice of - or was that a typical practice of Northern Utilities in '95 to leave a meter off and have some other entity turn the meter on?

A: Under certain circumstances, yes.

Q: Which circumstances?

A: Verbal agreements where we didn't want to inconvenience the customers so they had a temporary source of heat, so we might go in to set the meters, or a contractor was installing the heat but needed the heat on so that he could finish his work, then we would set the meters and leave them off for the contractor to turn on. And we do it to this day with certain contractors.

Burrill Depo. at 43-44.

Because the language of Northern's contract with Caleb is ambiguous and the industry standard/practice is in dispute, a factual issue exists regarding who was responsible for adjusting the pressure on the heaters. Summary judgment should therefore be denied on the breach of contract claim.

## NEGLIGENCE

Northern argues that it had no duty to Plaintiff to ensure that Square One or its subcontractor, MPI, would properly install, convert and inspect the Pine Ledge heaters. A utility company has no common law duty to prevent harm unless it owns or controls the apparatus that is defective or possesses actual knowledge of a dangerous situation. In this case, the undisputed facts demonstrate that Northern did not own or control the Rinnai heaters. Additionally, Northern had no duty to Plaintiff to inspect the work of either Square One or MPI. Northern's role was limited to its contractual relationship with Caleb. Northern was aware that Plaintiff had contracted with another party for the conversion of the heaters at Pine Ledge and thus it was entirely reasonable for Northern to anticipate that Plaintiff's contractor would fulfill its contractual obligations.

Caleb argues that a negligence claim can be based upon a duty arising out of contract. When Northern undertook to connect Pine Ledge to the natural gas main it had a duty to do so in a manner consistent with the standard of ordinary care for providing such services. The fact that the relationship was founded upon contract does not absolve Northern of the independent duty to satisfy that standard. It was the standard practice for the natural gas contractor to test and fire the units to ensure

11

their proper adjustment for natural gas usage. Northern's failure to abide by that practice was a breach of duty.

## DISCUSSION

A complaint may set forth alternative and even inconsistent theories. M.R.Civ. P. 8(e). The Plaintiff can therefore, plead both negligence and breach of contract. See e.g., Ahlgren v. Fabian, 1999 ME 6, ¶ 1, 722 A.2d 868, 869 (finding that facts alleged by plaintiff and presented at trial could properly generate both a negligence and breach of contract claim); Strickland v. Counsens Realty, Inc., 484 A.2d 1006, 1007 (Me. 1984)(upholding general verdict of money damages finding that builder could have been liable under "any and all" the theories of negligence, breach of contract and/or breach of implied warranty). Negligence, of course, must be properly plead. A negligence cause of action requires the establishment of a duty on the part of a defendant toward the plaintiff, a breach of that duty and an injury suffered by the plaintiff as a result of that breach. Gayer v. Bath Iron Works Corp., 687 A.2d 617, 621 (Me. 1996).

Northern argues that Plaintiff failed to allege that Northern had a duty in tort, separate and apart from it duty under contract. See Jacobson v. Leventhal, 148 A. 281, 282 (Me. 1930)("A person who . . . fails to perform his contract, is liable in an action on the contract for consequences that may reasonably be anticipated, but is not, by reason of breach of his contractual duty, liable to an action of tort for negligence"). However, it has been adequately alleged that apart from its contractual obligations, Northern owed a duty to Caleb to use due care and follow

12

the proper procedures in testing, firing and adjusting the heaters. This allegation is consistent with the Restatement (Second) Torts that provides that: "[O]ne who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." RESTATEMENT (SECOND) TORTS § 299A (1965). As well, because Northern has argued that it did not have a contractual obligation to adjust the gas pressure, it is necessary for Caleb to plead negligence as an alternative.

Northern also argues that Northern did not proximately cause Plaintiff's harm and therefore can not be liable to Plaintiff in negligence. However, as explained above, whether or not Northern was responsible for adjusting the pressure of the heaters (the failure of which caused damage to the heaters) is a disputed question of fact that cannot be resolved on summary judgment.

The clerk may incorporate this order in the docket by reference.

Dated: June 27, 2001

Michael A. Nelson, Esq. - PL
Peggy L. McGehee, Esq. - DEF. NORTHERN UTILITIES, INC.
Gerard O. Fournier, Esq. - DEF. MAINE PROPERTIES
INC. d/b/a MPI PLUMBING, HEATING AND AIR
CONDITIONING
Jonathan W. Brogan, Esq. - DEF. PINE STATE PLUMBING & HEATING, INC.

G. Arthur Brennan
Justice, Superior Court

13