STATE OF MAINE                    SUPERIOR COURT
WALDO, SS.                        Docket No. CV 00-024

FCM — WAL 7/16/2001

Richard S. Mann,          )
        Plaintiff,          )
                      )
                      )
         v.            )             **FINDINGS OF FACT**
                      )     **AND CONCLUSIONS OF LAW**
                      )
                      )
Thomas Flacke, et al,      )
        Defendant.       )

STATE OF MAINE
Waldo County Superior Court

JUL 16 2001

REC'D AND FILED
Joyce M. Page, Clerk

      In the late 1990's the Defendants decided to sell the house in Morrill, Maine they had owned for almost a quarter of a century so they could build a new house across the road. The house and barn they sold to Plaintiffs was a rather typical, rural Maine dwelling which was more than a century old. It had been routinely maintained by the Defendants.

      One significant new feature added to their house was a steel roof which was only a year old when Defendants sold to Plaintiffs. It had been installed by a long-time vendor of such roofs, Brian Mitchell who testified. The roof was the source of one of the major complaints of the Plaintiffs who testified that the roof roared in the wind.

      Their other major complaint was the oil consumption of the furnace. The basis of that complaint was the language used by Mr. Flacke in the three page property disclosure he filled out when requested to do so by his agent, Sam Mitchell. The actual language used appear on page three and is found to have been written in part by Mr. Flacke and in part by Sally Demeter[1].

---

1. Ms. Demeter, apparently, was present throughout trial but did not testify. The Court says "apparently" because a woman was seated next to Mr. Flacke throughout the trial and was inferentially identified by him as his wife, Sally Demeter.

The completed form reads:

"Heating system: Type: Oil fired Hot water
Consumption: 800 gal per year +/-.
Comments: Also supplies hot water for household use - 3 zones

The phrase "3 zones" was the part written by Ms. Demeter. The evidence, the Court finds, proves there was considerably more gallonage consumed than was disclosed by the Defendants' writing.

Mr. Flacke testified that he believed that the gallonage was accurate for heating. He believed that a person would realize that hot water would be recognized as generating a greater number of gallons since he felt that it would take "one to two gallons a day" to heat the hot water used in addition to the 800+/- needed for heating. There is some merit to that position but the phrase: "- 3 zones" impugns his view because the phrase must relate to the furnace and not the hot water component of the system.

Except for his testimony, all other evidence presented, including especially Mr. Mitchell's, suggests that the assumption to be derived from the language was that the house used 800 gallons of fuel oil, more or less, for the heating of the house and the hot water. Mr. Kelly argues that the language admits more than one interpretation and that there was a latent ambiguity. Had the first phrase read: "800 gal per year - 3 zones" and the comment was as written, the Court would agree. But the contrary is the case.

A latent ambiguity is one which "occurs when . . . the facts extrinsic to the document controvert or in some way render unclear . . . apparently unambiguous terms." Snyder v. Haagen, 679 A.2d 510, 513 (Me. 1996). In Portland Valve v. Rockwood Systems, 460 A..2d 1383, 1387 (Me. 1983) the Maine Law Court said "The issue of whether a contract (here the Disclosure, see infra) is ambiguous is a question of law for the court. *See Eskimo Pie Corp v. Whitelawn Dairies, Inc*, 284 F.Supp. 987, 995 (S.D.N.Y. 1968). The interpretation of an unambiguous written contract is a question of law for the Court; the interpretation of ambiguous language is a question for the factfinder. *Zamore v Whitten*, 395 A.2d 435, 440 (Me. 1978). The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of the

instrument without resort to extrinsic evidence. . . Contract language is ambiguous when it is reasonably susceptible of different interpretations."

There is no latent ambiguity here. Maine's rule is: "[H]e who speaks (here Mr. Flack and Ms. Demeter) should speak plainly or the other party may explain to his own advantage." Monk v Morton, 139 Me. 291, 294 (Me. 1943)." "The rule calling for construction of a contract against the party drafting it presupposes an initial ambiguous contract, for, absent any ambiguity in the terms of a contract, the question of their meaning is purely one of law." Dufresne, J. Waxler v. Waxler, 458 A.2d 1219, 1224 (Me. 1983). "The Court is to ascertain the intention of the parties by looking at the agreement itself, taking into consideration the subject matter, motive and purposes of the parties as well as the object to be accomplished." Waltman & Co. v. Leavitt, 722 A.2d 862, 863 (Me. 1999) See also Bumila v. Keiser Homes, 696 A.2d 1091, 1094 (Me. 1997). The foregoing relates to formal statements made which are known to the maker to be considered by another such as the Plaintiffs here.

The Court finds as a fact that the number used "800 gal per year +/-" was a misrepresentation. That conclusion is based in large part on the addition of the phrase "3 zones" after the phrase: "[A]lso supplies hot water for household use". But for the phrase "3 zones", the Court would find an ambiguity and no misrepresentation.

With respect to fraud and misrepresentation, the question becomes whether the misrepresentation was a material one and whether the Plaintiffs justifiably relied on it. It is 'hornbook' law that to recover in fraud one must show justifiable reliance on a false representation of a material fact.

> "A person is liable for fraud if the person
> (1) makes a false representation (2) of a material fact
> (3) with knowledge of its falsity or in reckless disregard
> of whether it is true or false (4) for the purpose of
> inducing another to act or to refrain from acting in
> reliance on it, and (5) the other person justifiably relies
> on the representation as true and acts upon it to the
> damage of the plaintiff." Fitzgerald v. Gamester 658 A.2d
> 1065 (Me. 1995).

As to #5, see Ferrell v. Cox, 617 A.2d 1003, 1006-1007 (Me. 1992). The question of justifiable reliance is for the factfinder.

The Court finds the Plaintiffs' claim wanting in two regards. They did not justifiably rely on the misrepresentation and they have not established that it was a material fact.

The basis of these findings is the total absence of any relevant inquiry as to how the 800 gallons heated the house - that is to what degree level- , what steps were required by the Defendants to "winterize" their house so as to heat as they represented they did and what wood use was made of an obvious heat source.

It is clear that there was a wood stove in the kitchen. It is equally apparent that it did not pass with the sale. It was deleted from the Purchase and Sale agreement and when Beverly Mann testified she made clear the wood burning they now do. With the Plaintiffs' wood burning as they now do it but with no testimony of how the Plaintiffs prepare the house for winter, the misrepresentation cannot be found by this Court to have been of a material fact. More importantly, there was no justifiable reliance on it.

That is so notwithstanding Mr. Flacke's testimony that the wood stove in the kitchen was not a primary heat source. If inquiry had been made by Plaintiffs, that fact would have become relevant. Mr. Flacke said the stove was for "the ice storm" and some cooking. However, the facts disclose that the Plaintiffs were from Seattle and that Richard Mann was formerly from Hawaii. They had no experience with Maine winters and, strangely, made no inquiry that was shown by any evidence of what the 800 gallons would do for the house. How warm did they expect it to be from the 800 gallons ? They never asked such questions of anyone according to the evidence presented. It is clear that they now heat, together with 4 to 5 cord of wood, with about 1000 gallons of oil. No evidence was adduced that suggests that did not cover hot water use year round as well.

There is also a question of the breach of contract. The Court allowed an amendment to add a breach of contract count. One of the issues was

whether the attachment of the Disclosure Form to the Plaintiffs' copy of the Purchase and Sale was an inclusion of the statements in the Disclosure as a part of the contract. In <u>Harriman v. Maddocks</u>, 518 A.2d 1027 (Me 1986) the Law Court said: [w]hile it is true that the determination of whether an agreement is totally or partially integrated is a matter of law . . . [d]isputes over the existence of a binding agreement or the substance of negotiations present classic issues for the factfinder." "[I]f contract language is ambiguous or uncertain, its interpretation is a question of fact to be determined by a factfinder. See <u>Kandlis v .Huotari</u>, 678 A2d 41,43 (Me. 1996) and <u>Town of Lisbon v.Thayer Corp.</u>, 675 A.2d 514, 516 (Me 1996).

In <u>Portland Valve v. Rockwood Systems</u>, 460 A..2d 1383, (Me. 1983) the Maine Law Court said "The issue of whether a contract is ambiguous is a question of law for the court. *See Eskimo Pie Corp v. Whitelawn Dairies, Inc*, 284 F.Supp. 987, 995 (S.D.N.Y. 1968). The interpretation of an unambiguous written contract is a question of law for the Court; the interpretation of ambiguous language is a question for the factfinder. *Zamore v Whitten*, 395 A.2d 435, 440 (Me. 1978). The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence. . . Contract language is ambiguous when it is reasonably susceptible of different interpretations."

"The Court is to ascertain the intention of the parties by looking at the agreement itself, taking into consideration the subject matter, motive and purposes of the parties as well as the object to be accomplished." <u>Waltman & Co. v. Leavitt</u>, 722 A.2d 862, 863 (Me. 1999) See also <u>Bumila v. Keiser Homes</u>, 696 A.2d 1091, 1094 (Me. 1997).

The Law Court in <u>Handy Boat Service Inc. v. Professional Service, Inc.</u>, 1998 Me. 134, 711 A.2d 1306 (Me. 1998) dealt, inter alia, with a missing exhibit and found that irrelevant given the trial court's analysis. But <u>Clarke v. DiPietro</u>, 525 A.2d 623 (Me. 1987) says the law ". . . operates to exclude from judicial consideration extrinsic evidence offered to vary or add to or contradict the terms of an integrated written agreement." From the foregoing, it seems clear to this Court that the attachment of the Disclosure Form to the Plaintiffs' copy of the Purchase and Sale was

meant to and did form the Plaintiffs' contract.

Remembering that <u>Clarke v. DiPietro</u>, examines the parol evidence rule as does <u>Harriman v. Maddocks</u>, 518 A.2d 1027 (Me 1986) wherein the Law Court said: " [w]hile it is true that the determination of whether an agreement is totally or partially integrated is a matter of law . . . [d]isputes over the existence of a binding agreement or the substance of negotiations present classic issues for the factfinder," the issue is for the Court. Finally, <u>Handy,</u> supra, says: "[A]pplication of the rule requires an initial finding that the parties intended the writing to integrate their understandings concerning the subject matter of the agreement. (Cit. om.) To determine whether integration was intended and whether the scope of integration was complete or partial, the court may consider extrinsic evidence." The foregoing means that although the Defendants' did not have a copy of the Disclosure attached to their copy of the Purchase and Sale agreement, it was an integral part of their dealings with the Plaintiffs.

Thus the question is whether or not the contract was breached. This Court concludes that the Plaintiffs did not rely on the misrepresentation as has been noted. Moreover, the question is not whether or not Plaintiffs have paid more for fuel than they anticipated but whether or not they paid more for their home than would have been the case if the fuel oil disclosure had been unmistakably clear. This Court finds as a matter of fact and law that the fuel problem would not have changed the Plaintiffs intent to purchase at the price they paid.

The language of <u>Horner v. Flynn</u> 334 A.2d 194 (Me. 1975) is compelling. At page 204 the Court said:

> 'That it is the burden of the plaintiff to prove affirma-
> tively that he was actually harmed, and that his
> damages were the proximate result of his reliance
> upon the alleged misrepresentation is clear. Coffin
> v. Dodge, supra. (146 Me. 3) Stewart v. Winchester
> 133 Me. 136, 174 A. 456 (1934).

and, later,

> "That the plaintiff sustained some pecuniary loss
> as a direct result of defendant's misrepresentations
> is not open to serious question. The measure of his loss

is determined by the difference between the actual value of the property at the time of purchase and and its value if it had been as represented (the *benefit-of-the- bargain"* rule). <u>Shine v. Dodge</u>, 130 Me. 440, 442,157 A. 318 (1931).

<u>Stevens v. Bouchard</u>, 532 A.2d 1028, 1030 (Me. 1987) announced as Maine law a declination to impose upon the seller of "...every existing home the burden of an implied warranty of habitability". Only a "special relationship" changes that concept. Such circumstances are not present here. That is, the misrepresentation existed. If the Plaintiffs had sought to terminate the contract prior to closing because of it, the law would probably have afforded them relief. But the evidence from Sam Mitchell, Henry Grover, the Plaintiffs' mortgagor's appraiser, and William Flanders, Plaintiffs' Building Inspector demonstrates that the Plaintiffs suffered no economic loss. They received, at least, the benefit of their bargain.

The other primary fact issue is the steel roof. The evidence suggests and the Court finds that the roof was installed in a competent fashion by a reputable installer. The quality of the material and the manner of introduction was well within acceptable limits. That is, there is no evidence of defective workmanship.

With respect to the roof, the Court heard a tape produced by Richard Mann and played in the courtroom over the vigorous objection of Mr. Kelly. The tape, having been heard, is of no value to the Court in its resolution of the issue. It is impossible for the Court to put the tape in proper perspective. Mr. Kelly's objection was based in part on <u>Daubert v. Merrell Dow Pharmaceuticals, Inc,</u> 113 S.Ct 2786 (1983) which rejected the "Frye" rule. <u>State v. Williams</u>, 388 A.2d 500 (Me. 1978) had rejected that rule some years earlier. The Maine Law Court, (Wernick, J.) said: "[O]n the approach we adopt the presiding Justice will be allowed a latitude which the *Frye* rule denies to hold admissible in a particular case proffered evidence . . . if a showing has been made which satisfies the Justice that the proffered evidence is sufficiently reliable to be held relevant." Id, 504.

In <u>Williams</u> the issue related to the nature of the human voice and the spectrograph process which were some of the safeguards Mr. Kelly

lamented were missing in the case at bar. However, both the Supreme Court of the United States and the Maine Law Court have recognized that the initial finding is by the trial judge as a "gatekeeper". Therefore, without having heard the tape, the Court would have failed in its task to determine whether the factfinder, here the Court, might be helped by the evidence. The Court listened and is satisfied that the tape is not helpful in the factfinding process. Accordingly, it was irrelevant evidence and is excluded on that basis.

Thus the issue of the roof noise is to be resolved on the basis of the oral testimony presented. The Court concludes and finds as a fact that the noise from the house roof was not sufficient so that there were material misrepresentations made as to the condition of the roof. See <u>Stevens v. Bouchard</u>, supra. The Court notes that no changes in the roof structure have been made. That is significant because the Plaintiff, Richard Mann professed to have considerable experience as a carpenter and testified to the nailing process which he felt would solve the problem.

Although he testified that "hundreds of nails" would have to be driven into the surfaces to produce the result he wanted to achieve, Richard Mann did not quantify it further. Moreover, no questions were asked of Brian Mitchell as to whether, if the condition existed as claimed by the Plaintiffs, the scheme testified to by the Plaintiff would reduce the sound without permanently damaging the roof and what it would cost[2]. In fact, with respect to the roof, no damages were projected by either Plaintiff. Further, there was no expert evidence produced by the Plaintiffs with respect to the roof.

The measure of damages for loss of both real and personal property may be measured by the cost of repair or by diminution in value of the real or personal property damaged. See <u>Sullivan v. Young Bros. & Co., Inc</u>, 91 F. 3d 242 (C.A. 1(Me.) 1996 and <u>Borneman v. Milliken</u>,124 A. 200, 123 Me. 488, 495 (Me. 1924) " [T]he true rule was, as given to the jury, the difference in value on the plaintiffs' premises before and after . . . . ." Those damages for breach . . . are measured by either the difference in value between the performance promised and the performance rendered, or the

---

2. The roof cost some $5500.00 to install new.

amount reasonably required to remedy the defect" and "In breach of contract cases we have upheld repair or replacement damage awards of the amount required to bring a home into compliance with the contract". Anuszewski v. Jurevic, 566 A.2d 742 (Me. 1989). As to personal property, see Black v. Goodrich, 237 A.2d 148 (Me. 1968) and Collins v. Kelly, 179 A. 65, 133 Me. 410 (Me. 1935). Whether the relief sought is treated as being for either real or personal property, there is insufficient evidence of damages to generate an award for either.

More importantly, the Court finds that the Plaintiffs have failed to meet their burden of proof on the primary issue relating to the roof. The Court is satisfied that the roof was in a condition satisfactory to the Defendants and that they believed it was in good condition. Thus they had no duty of any sort respecting the roof and the problem, if there is one, rests with the Plaintiffs because the roof has not affected their economic position with respect to the house. That Plaintiffs might have a duty to disclose what they perceive to be loud noises if they decide to sell, does not mean that the Defendants have any liability for misrepresentation nor for breach of contract.

The Order will be:
      Count I: Judgment for the Defendants;
      Count II: Judgment for the Defendants; and
      Count III: Judgment for the Defendants.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R.Civ.P Rule 79 (a).

Dated: July 16 , 2001

_____
Francis C. Marsano
JUSTICE, SUPERIOR COURT

| Date Filed July 25, 2000 | Waldo County | Docket No. CV-00-024 |

Action Misrepresentation/Fraud

RICHARD S. MANN and BEVERLY I. MANN  vs. THOMAS FLACKE and SALLY DEMETER

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Christopher L. Mann, Esq. | William S. Kelly, Esq. for both Defts. |
| WATSON & MANN, P.A. | KELLY & BURKE, LLC |
| 9 Centre St. | 96 High St. |
| Bath, ME 04530 | Belfast, ME 04915 |
| Tel: 443-1606 | Tel: 338-2702 |

| Date of Entry | |
|---|---|
| 7/24/00 | Defts' Answer to Plffs' Complaint and Affirmative Defenses dtd. July 18, 2000, filed. |
| 7/24/00 | Motion to Dismiss dtd. July 19, 2000, filed by Defts. Proposed Order filed. |
| 7/25/00 | Complaint dtd. July 12, 2000, filed. Complaint Summary Sheet filed. |
| 7/25/00 | Summons dtd. July 12, 2000, filed. |
| 7/25/00 | Notice and Acknowledgement for Service by Mail dtd. July 12, 2000, filed with Acknowledgement of Receipt of Summons and Complaint for both Defts. by William S. Kelly, Esq. on July 17, 2000. |
| 7/25/00 | Case File Notice to atty. Mann. |
| 7/25/00 | Scheduling Order filed. Discovery deadline is March 1, 2001. (Marden, J. Notice of entry and copy Scheduling Order to attys., Mann & Kelly. |
| 08/03/00 | Plff's Response to Defts' Motion to Dismiss dtd. Aug. 2, 2000, filed. |
| 09/26/00 | Notice of setting for hearing on Deft's Motion to Dismiss on Thursday, Oct. 19, 2000 at 9:00 a.m. to attys. Mann and Kelly. (Hjelm, J. |
| 10/19/00 | Attys. Mann and Kelly present for hearing on Motion to Dismiss. After hearing, matter taken under advisement. |
| 10/25/00 | Plffs' Expert Witness List, filed. |
| 11/2/00 | ORDER dtd. Nov. 2, 2000 signed, filed and entered. (Hjelm, J. --For the foregoing reasons, the defendants' motion to dismiss is denied. (Hjelm, J. |
| 11/3/00 | Notice of entry and copy of order to attys., Mann & Kelly. |
| 11/6/00 | Notification of Discovery filed by Defts. showing service of Notice of Deposition of Beverly Mann & Richard Mann and Witness Subpoena for Deposition of Christopher Mann, Esq., served on atty. Mann on Nov. 3, 2000, filed. |
| 11/7/00 | Rule 26(b) Designation dtd. Nov. 3, 2000, filed by Defts. |
| 01/31/01 | Notification of Discovery Service dtd. Jan. 29, 2001 filed by Plffs. showing service of Plffs' Interrogatories and Request for Production of |