STATE OF MAINE
CUMBERLAND, SS.

STATE OF MAINE
CUMBERLAND, SS
CLERK'S OFFICE

2002 DEC -2 A 9: 23

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-00-352

TEH - CUM - 12/2/2002

FELLOWS EVENTS, INC. f/k/a
GIRAFFE EVENTS, INC., and
GIRAFFE MARKET, INC.,

DONALD L. GARBRECHT
LAW LIBRARY

JAN 6 2003

Plaintiffs

vs.

DECISION AND ORDER

GIRAFFE EVENTS, LLC,

Defendant

On January 22, 1999, the plaintiff sold its event management and production business to the defendant pursuant to an Asset Purchase and Sale Agreement ("Agreement"). Plaintiff's Exh. 1. Subject to adjustments set forth in the Agreement, the defendant paid the following: (a) $220,000 for certain enumerated business assets payable partly by a cash payment of $100,000 and by a promissory note in the amount of $120,000 ("First Note"); (b) a cash payment of $2,700 for the plaintiff's prepaid expenses and deposits relating to the New England Tech Expo show and to certain leased premises; and (c) a promissory note in the amount of $50,000 ("Second Note") as additional consideration for goodwill and assets. Plaintiff's Exh. 1, Arts. 6, 7 and 8. Payment item (a) was identified in Article 6 of the Agreement as the "Purchase Price", and item (c) was identified in Article 7 as the "Additional Purchase Price". Id., Arts. 6 and 7.

The Agreement required the plaintiff to remit to the defendant 40% of the net profit realized from the Maine Media Market Show scheduled for February 1999. Id., Art. 6. It also provided for downward adjustments to the Purchase

1

Price and to the Additional Purchase Price based upon the amount of "Gross Revenues" realized by the defendant from the post-closing production of certain events. *Id.*, Arts. 7 and 8. The Purchase Price was to be adjusted dollar-for-dollar for each $10,000 increment of Gross Revenues below a threshold amount of $300,000, and the Additional Purchase Price was to be similarly adjusted for each such increment below a threshold amount of $500,000.

For determining adjustments to the Additional Purchase Price, "Gross Revenues" was defined as post-closing gross receipts accruing from eight specified shows

> or similar events ... which Purchaser shall use its best efforts to successfully produce and manage; and such other events that the Seller or its predecessors has previously produced and for which Purchaser obtains mutually agreeable commitments in the period of six (6) weeks from the date of closing.

*Id.*, Art. 7 (emphasis added). "Gross Revenues" for determining adjustments to the Purchase Price did not include the above-emphasized words "mutually agreeable", but was otherwise identical. *Id.*, Art. 8.

The First Note was a negotiable instrument.[1] 11 M.R.S.A. § 3-1104. Although it did not expressly refer to the Agreement, the defendant's obligation to pay the instrument was subject to adjustment under Article 8. 11 M.R.S.A. § 3-1117; *Rogers v. Jackson*, 2002 ME 140, ¶13, 804 A.2d 379, 382. The Second Note was expressly subject to the terms and conditions of Article 7 of the Agreement and was not a negotiable instrument.[2] 11 M.R.S.A. § 1106(1)(c). The defendant's obligation to pay the Second Note was also subject to

---

[1]*See* Plaintiff's Exh. 2.
[2]*See* Plaintiff's Exh. 3.

adjustment under the Agreement. *Id.*

The defendant made twelve monthly payments on the First Note totalling $22,444,32, but stopped after the January 22, 2000 payment. It has not made any payments on the Second Note.

In this action, the plaintiff asserts that the defendant is in default of both promissory notes and seeks to collect the alleged balance due under each. The defendant counters that after applying adjustments to which it is entitled, there is not only no balance due on either note, the defendant is entitled to a refund of the payments it made on the First Note. The defendant also seeks its alleged share of the net profit from the Maine Media Market Show.

In large measure, the outcome of this case turns on the meaning of "Gross Revenues" in Articles 7 and 8 of the Agreement. The definitions are ambiguous in at least two respects: first, as to the meaning of the phrase "or similar events"; and, second, as to the time-period, if any, within which Gross Revenues are to be counted for determining any price-adjustments. "The issue of whether contract language is ambiguous is a question of law for the Court." *Portland Valve, Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1387 (Me.1983).[3] Contract language is ambiguous when it is reasonably susceptible to different interpretations. *People's Sav. Bank v. Recoll Management, Inc.*, 814 F.Supp. 159 (D.Me.1993). "Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties." *Portland Valve*, 460 A.2d at 1387. Accordingly, the court must look to the intent of the parties

---

[3]A motion justice has already determined that the meaning of "Gross Revenues" in Articles 7 and 8 of the Agreement is ambiguous as a matter of law in this case. *See* Order, dated November 1, 2001.

3

at the time they entered into the Agreement. *Waltman & Co. v. Leavitt*, 1999 ME 4, ¶ 12, 722 A.2d 862, 863; *see also Interstate Indus. Unif. Rental Serv., Inc. v. F.R. Lepage Bakery, Inc.*, 413 A.2d 516, 519 (Me. 1980) (allowing evidence of negotiations and prior agreements in order to determine whether a contract was completely or partially integrated).

A.   <u>Gross Revenues</u>

In general, "Gross Revenues" under the Agreement means post-closing gross receipts from two sources:  first, the eight listed shows "or similar events" ("first source of gross receipts"); and, second, "other events" previously produced by the plaintiff or its predecessors and for which a timely post-closing "commitment" is obtained by the defendant ("second source of gross receipts").[4] The course of the parties' negotiations, including the evolution of the "adjustment" language in their multiple re-drafts of the Agreement, make clear that the initial expansive definition for the source of "Gross Revenues" proposed by the plaintiff ("all gross receipts from whatever sources") devolved to a more limited definition in the final draft, and the initial limitation to "calendar year 1999" for determining price-adjustments culminated in the absence of any stated time-period. *See e.g.*, Defendant's Exh. A; and Plaintiff's Exhs. 1, 15, 17, 18, 19, 20, 22, 56 and 57. This analysis reveals that the parties did not intend to include every post-closing event produced by the

---

[4]Although the term "commitment" is not defined in the Agreement, in the context of this contract action it is commonly understood to mean a promise or contractual obligation. *See* The American Heritage Dictionary Of The English Language, New College Edition, at 268 ("An engagement by contract involving financial obligation"); Random House Webster's Unabridged Dictionary, 2d ed., at 412 ("a pledge or promise; obligation"); Webster's II New Riverside University Dictionary, at 287 ("Something pledged, esp. a contractual engagement involving financial obligation").

4

defendant in the calculation of Gross Revenues, and did not intend to limit that calculation to shows produced or revenues received in 1999.[5]

(i)    "Or Similar Events"

The first source of gross receipts included eight enumerated shows "or similar events" which were to be produced by the plaintiff after the closing. The word "similar" is commonly understood to mean, "[r]esembling though not completely identical". WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY, at 1085.[6]  Thus, "similar events" include those that resemble or are generally like any of the enumerated shows. This can reasonably include events that are replacements or substitutions for the listed shows, as well as other similar events in addition to them.

The defendant argues that the word "or" is used as a disjunctive to limit the meaning of "similar events" to replacements and substitutions. The court disagrees. If the parties had intended that limitation, they could have simply and clearly said so in the Agreement. Based on the parties' pre-closing negotiations, which included references to other shows in the plaintiff's business inventory,[7] it is reasonable to infer that the parties intended the word "or" to have a conjunctive quality that included other additional events similar in nature to the enumerated shows. *See, e.g., City of Westbrook v. Teamsters*

---

[5]*E.g.*, the definition of "Gross Revenues" in the Agreement specifically acknowledges that one of the listed events (Maine Today Job Fair) was scheduled to occur in February 2000.

[6]The word is also defined as "[n]early corresponding; resembling in many respects; somewhat like; having a general likeness." BLACK'S LAW DICTIONARY, rev. 4th ed., at 1554.

[7]*See e.g.*, Plaintiff's Exhs. 6, 8, 9, 10, 11, and 14;

*Local No. 48*, 578 A.2d 716, 721 n. 4 (*citing Wilson Stream Dam Co. v. Boston Excelsior Co.*, 105 Me. 249, 252, 74 A. 115, 116 (1909)) (the word "and" in a contract may be construed as "a convertible term used in the sense of 'or' " to make sense of the contract).

However, it is apparent from a comparison of the contract language regarding the first source of gross receipts and the second source that the parties did not intend "or similar events" to be without any limits. The first source included receipts from specified events for which pre-closing commitments had been obtained, as well as other "similar events". The second source included gross receipts from "other events" previously produced by the plaintiff, but not secured by any commitments at the time of closing, and for which the defendant obtained timely commitments after the closing. The Agreement required the defendant to "use its best efforts to successfully produce and manage" the first source events, but did not impose a like requirement with respect to second source events. This is a significant distinction. It is reasonable that the seller would want a "best efforts" condition imposed upon events being transferred to the buyer for which the seller already had obtained commitments, and upon which the threshold for adjustjments to the Purchase Price were to be determined.

This interpretation seems all the more reasonable in light of the fact that the Agreement does not specify the time-period within which gross receipts are to be counted for determining any adjustments to the Purchase Price.[8] it may

---

[8]Earlier negotiations and drafts of the Agreement did refer to time limits. *See e.g.*, Defendant's Exh. A (calendar year 1999); Plaintiff's Exhs. 10 (operating year 1999), 15 (fourteen months from the closing), 17 (twelve months from the closing), and 18 (gross receipts from 1999 events).

be inferred from the evidence that the parties intended the time-period to be measured by the time required to produce the shows identified in the Agreement, or their substitutions or replacements, and any others that qualified as "similar events". Thus, the court concludes that the first source of gross receipts was intended by the parties to include events for which commitments had been obtained by the plaintiff pre-closing, but did not include shows for which the defendant obtained commitments post-closing, and that the phrase "or similar events" means

> (a) events that were substitutions or replacements for any of the eight shows enumerated in the Agreement; and
>
> (b) events in addition to the eight enumerated shows that resembled or were generally like any of those included in that enumeration, and for which the plaintiff had obtained commitments before the closing.

See e.g., Plaintiff's Exhs. 6, 11. Based upon the foregoing, the countable produced events for the first source of gross receipts were the Maine Media Market Show, two New England Tech Expos (Portland and Manchester), and two Maine Today Job Fairs (a/k/a Careers 2000 Job Fair).[9] See Plaintiff's Exh. 51. The defendant also produced the Maine Business Expo in 1999. However, there is no competent evidence upon which the court can conclude that it was

---

[9]Three of the events listed in the Agreement were not produced by the defendant: the two Maine Sports Expo shows, and the Valcom Technology Conference. The court does not agree with the plaintiff's assertion that the simple fact that these shows did not go on means that the defendant breached its contractual obligation to "use its best efforts to produce" those shows. To the contrary, there is evidence that the failure of the Maine Sports Expo shows was attributable to a partnership relationship required by the customer which the defendant found to be undesirable, and the failure of the Valcom Technology Conference was attributable to that customer's prior dissatisfaction with the plaintiff.

an event similar to the eight listed shows.[10]

     (ii)    <u>Post-Closing Commitments for "Such Other Events"</u>

As previously noted, the second source of gross receipts included receipts from "other events" previously produced by the plaintiff or its predecessors and for which the defendant obtained commitments within six weeks following the closing.

Prior to the closing, the plaintiff had produced an event for the Portland Chamber of Commerce called Leads to Business. However, as of the closing the plaintiff did not have a commitment from the Chamber to produce another such show. On April 6, 1999, more than six weeks after the closing, the defendant entered into a contract with the Chamber to produce a Leads to Business show. Plaintiff's Exh. 32. In the context of this action, the court concludes that the term "commitment" means a promise or contractual obligation such that the commitment date for the Chamber's show was the contract date.[11] Thus, the Leads to Business show does not constitute a countable source of gross receipts for determining Gross Revenues,[12] and there

_____

[10]John Fellows testified that "similar shows" meant not only those similar in type or nature, but also those that had similar logistical production requirements (*e.g.*, similar management, accounting, promotional and production requirements). Even accepting his definition, there is still insufficient evidence to include the Maine Business Expo.

[11]*See* note 1, above. The plaintiff argues that a commitment had to precede the contract date and asserts that in 1998 it took at least three weeks to get the Chamber from commitment to contract for the Leads to Business show. Plaintiff's Post-Trial Brief at 6. Even accepting this assertion and applying the "three weeks" experience in 1998, a commitment in 1999 would have been made around March 16, 1999, more than a week after the Agreement's cut-off date of March 6, 1999.

[12]The only other documentary evidence regarding the Leads to Business show was a letter from the President of the Chamber to the General Manager of the Cumberland County Civic Center, dated January 27, 1999, asking that the dates of October 13 & 14 be held by the civic center for the Chamber's 1999 show. Plaintiff's

is no evidence of any "other event" previously produced by the plaintiff or its predecessors for which the defendant obtained a "commitment" or "mutually agreeable commitment" within six weeks from the closing date.

B.    Gross Receipts

Based upon the foregoing analysis, the defendant produced three countable events in calendar year 1999 (i.e., Maine Media Market Show; New England Tech Expo-Portland; and Maine Today Job Fair) which, collectively, generated gross receipts of $123,815. *See* Stipulations; Plaintiff's Exh. 51. In calendar year 2000, it produced two countable events (i.e., New England Tech Expo-Manchester; and Careers 2000 Job Fair) which generated gross receipts of $33,991.[13] *Id.* In all, these shows generated countable gross receipts of $157,806.

Since the total gross receipts are $142,194 less than the $300,000 threshold specified in Article 8 of the Agreement, there is a downward adjustment of $140,000 to the $220,000 Purchase Price. Accordingly, the Purchase Price, as adjusted, is $80,000, and the adjustment is retroactive to the closing date. Plaintiff's Exh. 1, Art. 8. The defendant has paid $122,444.32, comprised of cash paid at closing ($100,000) and payments on the First Note ($22,444.32). As a result, there has been an overpayment of the Purchase Price in the amount of $42,444.32.

---

Exh. 27. The letter concluded with the statement that "[a]s we progress in our planning, I will confirm the final decision." *Id.* Thus, the Chamber had not made a commitment as of the date of this letter.

[13]The Careers 2000 Job Fair produced in April 2000 is included in the calculation of gross receipts because it represents the second of the two job shows listed in the Agreement.

Similarly, the total gross receipts are $342,194 less than the $500,000 threshold specified in Article 7 of the Agreement resulting in a downward adjustment to the Additional Purchase Price that exceeds the $50,000 maximum allowable adjustment and negates the entire Additional Purchase Price reflected by the Second Note.

D.  Maine Media Market Show

Pursuant to Article 6 of the Agreement the plaintiff was required to remit to the defendant 40% of the net profit, net of uncollected accounts receivable, from the Maine Media Market show held in February 1999. That figure was to be determined by a certified public accountant agreed-upon by the parties. The CPA calculated the remittance amount owed by the plaintiff to the defendant to be $7,996, which remains due and owing. See Plaintiff's Exhs. 1, Art. 6; 36. There is no credible evidence to the contrary.

Based upon all of the foregoing, and pursuant to M.R. Civ. P. 79(a), the Clerk is directed to enter this Decision and Order on the Civil Docket by a notation incorporating it by reference and the entry is

A.  On Counts I and II of Plaintiff's Complaint, Judgment for Defendant;

B.  On Count I of Defendant's Counterclaim, Judgment for Defendant in the amount of $42,444.32; and

D.  On Count II of Defendant's Counterclaim, Judgment for Defendant in the amount of $5,548.

Dated:  December 2, 2002

_____
Justice, Superior Court

10

Date Filed ___06-02-00___ ___CUMBERLAND___ Docket No. _CV 00-352_
County

Action ___CONTRACT___

FELLOW EVENTS, INC. fka                    GIRAFFE EVENTS, LLC
GIRAFFEE EVENTS, LLC

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| XXFREDERICKXXBXXFINBERGXXESQXXXX3X4XXXX  XXXXXBXXXXXX7X22XXXPORTLANDXXMEXX0XX1X2XXXXXXX  XXXXXXXXXXXXXXXXXXXXESQ    W/D  WILLIAM D. ROBITZEK, ESQ.  P.O. Box 961  Lewiston, ME 04243-0961  (207) 784-3576 | DANIEL L. CUMMINGS, ESQ. 774-7000  PO BOX 4600  PORTLAND ME 04112-7000 |

| Date of Entry | |
|---|---|
| 2000 June 06 | Received 06-02-00:  Complaint Summary Sheet filed.  Complaint with Exhibits A,B, and C filed.  Plaintiff's Notification of Discvery Service filed.  Plaintiff Fellow Events, Inc.'s First Request for Production of Documents Propounded Upon Defendant Giraffe Events, LLC served on Giraffe Events, LLC on 06-02-00. |
| " " | |
| " " | |
| June 23 | Received 6-22-00.  Summons filed showing officer's return of service on 6-8-00 upon Giraffe Events LLC to Lauren Epstein Ast. Pr. |
| June 28 | Received 6-28-00.  Defendant's Answer to Complaint, filed. |
| July 10 | Received 7-10-00:  Scheduling Order filed. (Warren, J.)  Discovery Deadline is March 10, 2001.  On 7-10-00 copy mailed to Frederick Finberg and Daniel Cummings, Esquires. |
| July 13 | Received 7-12-00  Plaintiffs answer to defendants counterclaim filed. |
| Aug. 15 | Received 08-15-00:  Letter from Frederick B. Finberg, Esq. with attachment requesting a discovery Conference filed. |
| Aug 31 | Received 8-31-00:  Conference Record filed. (Warren, J.)  The Entry Will Be:  At Plaintiffs expense, defendant to provide data files containing accounting data in electronic form after removing non patient, confidential or security information.  Copy mailed to Frederick Finberg and Daniel Cummings, Esquires. |